UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANDRE R. KABIR,

              Plaintiff,

      v.

PATRICK R. DONAHUE,
POSTMASTER GENERAL,
UNITED STATES POSTAL
SERVICE, *et al.*,

              Defendants.

Case No. 2:09-CV-01061
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

OPINION AND ORDER

This matter is before the Court for consideration of Defendant's Motion for Summary

Judgment. (ECF No. 79.) For the reasons that follow, Defendant's Motion is **GRANTED**.

I. BACKGROUND

A.    **Procedural History**

Plaintiff, Andre R. Kabir, who is proceeding *pro se*,[1] brings this action against the

Postmaster General of the United States Postal Service ("USPS"), alleging various claims

including race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e *et seq*. ("Title VII"), and disability discrimination for failure to accommodate

in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

On August 29, 2011, the Court granted Defendant's partial dismissal of Plaintiff's

---

[1] Although Plaintiff's briefing and citations at times lack clarity, the Court has construed
Plaintiff's *pro se* filings liberally. *See Yagley v. Occupat'l Safety & Health Admin., U.S. Dep't of
Labor*, 461 F. App'x 411, 414 (6th Cir. 2012) ("Of course, pro se litigants are to be afforded
liberal construction of their pleadings and filings.").

Amended Complaint.  The Court specifically found that only three claims were properly before

it:

(1)     Whether the [USPS'] decision to reassign Plaintiff from the Automated
        Package Parcel Sorter (APPS) Operation to the Dock Operation on or about
        April 15, 2006 constituted either race or gender discrimination, in violation
        of Title VII.

(2)     Whether the [USPS], acting through the Manager, Human Resources for the
        Agency's Chicago District, discriminated against him in retaliation for his
        prior [Equal Employment Opportunity ("EEO")] activity, in violation of Title
        VII, when on December 17, 2007 she informed him that he had not been
        selected for the position of District Complement Coordinator, EAS-21; and

(3)     Whether the [USPS'] decision to terminate Plaintiff that took effect on or
        about June 7, 2008 constituted race or reprisal discrimination, in violation of
        Title VII, or disability discrimination, in violation of the Rehabilitation Act.

(Opinion and Order 3, ECF No. 46.)  The Court dismissed the remainder of Plaintiff's claims.[2]

Within the instant Motion, Defendant moves for summary judgment as to all of Plaintiff's

remaining claims.  Plaintiff, on the other hand, maintains that there are facts in dispute and that a

trial is necessary.

**B.      Factual Background**

**1.      Transfer to Columbus, OH and Reassignment to Dock Operations**

Plaintiff is a former employee of the United States Postal Service ("USPS").  In July

2005, Plaintiff was reassigned from Chicago, IL to Columbus, OH.  Plaintiff maintains that he

was originally assigned to an Automation supervisor position in Columbus.  (Pl.'s Ex. N-1, ECF

---

[2] In allowing Plaintiff to file a Consolidated Amended Complaint the Court made clear
that Plaintiff was limited to the three remaining claims identified in the August 29, 2011 Opinion
and Order.  (Opinion and Order 4 n.2, ECF No. 50.)  Accordingly, to the extent the Consolidated
Amended Complaint in combination with Plaintiff's responsive briefing can be read as an
attempt to submit additional claims, any such request is denied.

No. 89-14.) Upon reporting for duty in July 2005, however, Plaintiff's superiors assigned him to work as a supervisor in the parcel/bundle sorter area in Tour 3. (*See* Kabir Aff. 1, ECF No. 79-1.) During the relevant time frame, Charles Brown was the Lead Manager, Distribution Operations ("LMDO") for Tour 3. (*See* Brown Aff. 1, ECF No. 79-2.) Upon his initial reassignment to Columbus, Manager, Distribution Operations ("MDO") Nick Lacy supervised Plaintiff. (Lacy Aff. 1, ECF No. 89-14.) According to Mr. Lacy, management assigned Plaintiff to his section so that Plaintiff could have weekends off as he had requested. (*Id.*) Mr. Lacy further avers that he explained to Plaintiff that if an Automation position, with weekends off, became available he would try to place Plaintiff in that position. (*Id.*) In early 2006, MDO Larry Wilson began managing Tour 3 where Plaintiff was assigned. (Wilson Aff. 1, ECF No. 79-3.)

At the time of his initial transfer, Plaintiff requested a time slot of 1:30 p.m. to 10:00 p.m. (Kabir Aff. 1, ECF No. 79-1.) An email from Plaintiff to Mr. Brown, however, reflects that in early February 2006 Plaintiff was working past his regular schedule. (Def.'s Ex. 1 at 21, ECF No. 79-1.) At this time, Plaintiff requested to return to a start time of 1:30 p.m. (*Id.*) In response, Mr. Wilson sent an email indicating that he would officially change Plaintiff's start time to 3:00 p.m. to reflect the hours Plaintiff had to work because of the circumstances of the Tour 3 position. (*Id.* at 22.) A day later, Plaintiff responded to this email asking Mr. Wilson not to change his scheduled start time from 1:30 p.m. to 3:00 p.m. (*Id.* at 23.) Within this email, which Plaintiff sent to both Mr. Wilson and Mr. Brown, Plaintiff explicitly stated "[p]lease do not hesitate to place me on a different assignment that reflects a more suitable time frame, as I have suggested, particularly if remaining on the [Automated Package Processing System] presents a scheduling conflict." (*Id.*) Moreover, in a March 2006 Plaintiff sent Mr. Wilson, Mr.

3

Brown, and Thomas Kelly—the Plant Manager—an email expressing his desire to receive regularly scheduled off days, his disinterest in working overtime, and his dissatisfaction with the change of his start time. (*Id.* at 33.) Within the same email, Plaintiff requested a meeting with Mr. Kelly to discuss his position.[3] (*Id.*)

On or around April 12, 2006, Mr. Brown reassigned Plaintiff to Dock Operations. (*See* Wilson Aff. 2, ECF No. 79-3; Brown Aff. 1, ECF No. 79-2.) According to Mr. Brown, the acting supervisor in Dock Operations had stepped down. (Brown Aff. 1, ECF No. 79-2.) Mr. Brown avers that he placed Plaintiff in the position because he needed a supervisor and felt that Dock Operations met Plaintiff's request of earlier hours and weekends off.[4] (*Id.* at 1, 2, 6.) Mr. Wilson states that he also thought the Dock Operations position was more conducive to Plaintiff's scheduling requests. (Wilson Aff. 2, ECF No. 79-3.)

Plaintiff objected to the Dock Operation position, which he describes as "the most undesirable assignment on the tour . . . ." (Kabir Aff. 4, ECF No. 79-1.) He maintains that he was reassigned to the Dock Operation because he was "stereotyped" as a strong black male. (*Id.* at 3.) Plaintiff asserts that other white and/or female supervisors remained in, or were given, more favorable assignments. (*See id.* at 2.) For example, Plaintiff stresses that Mr. Brown selected a white male associate supervisor, Brad Coon, to a different position that both Mr. Coon and Plaintiff both applied to. (*Id.*) Mr. Brown and Mr. Wilson, both of whom are also black males, maintain that neither race nor gender played a role in Plaintiff's reassignment. (Wilson

---

[3] Plaintiff indicates that in this meeting, Mr. Kelley endorsed Mr. Brown's supervisory assignments. (Kabir Aff. 3, ECF No. 79-1.)

[4] The parties' briefing indicates that the Dock Operations position had a 2:00 p.m. start time.

4

Aff. 2, ECF No. 79-3; Brown Aff. 2, ECF No. 79-2.)

### 2. Non-Selection for Chicago District Complement Coordinator Position

In September 2007, the USPS posted an announcement for an open District Complement Coordinator Position in Chicago, IL. (Def.'s Ex. 4 at 7, ECF No. 79-4.) Plaintiff was one of eight applicants ultimately interviewed for the position. (Def.'s Ex. 5 Attach. A, ECF No. 79-6.)

Rochelle Israel, Manager of Human Resources, conducted interviews and was the selecting official for the position. (Israel Aff. 1, ECF No. 79-5.) Ms. Israel avers, through an EEO Investigation Affidavit, that she made her selection based on the interview questions and that the most important criteria was each applicants knowledge of "the complement management tools . . . ." (*Id.*)

Ms. Israel ultimately selected William Bowles for the open position on or around December 17, 2007. (*See* Pl.'s Exs. I-2, I-10, ECF No. 89-9.) Ms. Israel states that Plaintiff did not answer her interview questions as well as Mr. Bowles. (Israel Aff. 1, ECF No. 79-5.) According to Ms. Israel, Plaintiff was unaware of the current systems the District used to manage complement.[5] (*Id.*) Additionally, Ms. Israel avers that Plaintiff failed to list, and she was unable to reach, any references from the Columbus office. (*Id.*) In contrast, Ms. Israel states that Mr. Bowles was working as an acting complement coordinator at the time of the interview, was aware of all of the necessary systems, and had excellent references. (*Id.*)

Ms. Israel maintains that she was not aware of Plaintiff's EEO activity at the time of the selection process. (*Id.*) In particular, Ms. Israel states that she working for the Chicago District

---

[5] Plaintiff stresses, and Ms. Israel's interview notes suggest, that Plaintiff did indicate at the interview that he was aware of the USPS' Complement Management and Selection Subsystem ("CMS"). (*See* Def.'s Ex. 5 at 6, ECF No. 79-5; Pl.'s Ex. BB at 14, ECF No. 96-20.)

during the period and was unaware of EEO activity involving Plaintiff in Columbus. (*Id.*)

During the selection process, Ms. Israel did contact an MDO in the Columbus Office and was

informed that Plaintiff had been off work due to stress.[6] (*Id.* at 1–2, 4.)

### 3. Plaintiff's Medical Condition, Attendance Record, and Termination

In May 2007, Plant Manager for Processing and Distrubtion Lauren Hawkins made a

comment during a diversity event about the possibility of celebrating a "white men's day" in

response to employee comments. (Pl.'s Ex. A-1, ECF No. 89-1; *see also* Pl.'s Ex. A-14, ECF

No. 89-1; Def.'s Ex. 7, ECF No. 79-9.) A number of employees complained about this comment

and proposal, and Plaintiff filed a complaint with the Equal Employment Opportunity

Commission ("EEOC"). (Pl.'s Ex. A-1, ECF No. 89-1; Def.'s Ex. 7, ECF No. 79-9.) Although

it appears there may have been some confusion following the incident, the record indicates that

no such event actually took place. (Pl.'s Ex. A-1, ECF No. 89-1.)

Following the incident, Plaintiff began missing work and receiving treatment from

Clinical Psychologist Deryck D. Richardson, Ph.D. (Def.'s Ex. 8, ECF No. 79-10.) On May 16,

2007, Dr. Richardson wrote a letter stating that Plaintiff was unable to perform work duties due

to psychological reasons and anticipated that Plaintiff would be able to return to work on June

20, 2007. (*Id.* at 1.) On May 23, 2007, Dr. Richardson completed a form diagnosing Plaintiff

with severe depression and anxiety, insomnia, and fatigue. (*Id.* at 2.) On June 18, 2007, Dr.

Richardson indicated that due to psychological issues Plaintiff could still not work. (*Id.* at 5.) At

this time, Dr. Richardson projected that Plaintiff would be able to return to part-time work on

---

[6] As detailed further below, beginning in May 2007 Plaintiff was absent from work for an extended period.

6

September 19, 2007 and to full-time work on October 2, 2007. (*Id.*) In September, October, and November 2007, Dr. Richardson repeatedly postponed the dates when he estimated Plaintiff could return to work  (*Id.* at 6–8.) On November 7, 2007, Dr. Richardson stated within a letter that Plaintiff would not be able to return to part-time work until March 5, 2008 and full-time work until March 19, 2008. (*Id.* at 8.) Dr. Richardson opined at this time that because Plaintiff perceived the Columbus location to be a hostile work environment, "re-location would probably hasten his return to work date." (*Id.*)

On December 21, 2007, the USPS issued Plaintiff a "Letter of Warning" regarding unsatisfactory attendance. (Def.'s Ex. 11, ECF No. 79-13.) The letter indicated that Plaintiff had been absent from work since May 10, 2007. (*Id.*) Moreover, Plaintiff had already received prior disciplinary warnings for unsatisfactory attendance and performance. (Def.'s Ex. 9, ECF No. 79-11; Def.'s Ex. 10, ECF No. 12.)

In February 2008, Dr. Richardson wrote an additional letter indicating that Plaintiff's concerns regarding work had intensified. (Def.'s Ex. 8 at 9, ECF No. 79-10.) Dr. Richardson stated that Plaintiff was particularly concerned about former USPS co-worker Terrell Jefferson. (*Id.*) According to Dr. Richardson's account, Plaintiff reported that in September 2005 he had terminated Mr. Jefferson from his position with the USPS. (*Id.*) Plaintiff further stated that Mr. Jefferson had later threatened and assaulted him. (*Id.*) In December 2007, Plaintiff saw a Columbus news story reporting that Mr. Jefferson had shot his wife and been involved in a standoff with police. (*Id.*; *see also* Pl.'s Ex. S-7, ECF No. 96-6.) Within the February 2008 letter, Dr. Richardson concluded that Plaintiff would be able to return to part time work on May 7, 2008 and full-time work on May 21, 2008. (Def.'s Ex. 8 at 10, ECF No. 79-10.) Dr.

Richardson once again suggested that "relocation would probably hasten his return to work date." (*Id.*) On February 20, 2008, Alvin D. Pelf, M.D., also indicated that Plaintiff was unable to work and concurred in Dr. Richardson's recommendation of a transfer of job location. (Pl.'s Ex. J-9, ECF No. 89-10.)

On February 20, 2008, the USPS issued Plaintiff a Notice of Proposed Removal stating its intent to remove Plaintiff from postal service employment for unsatisfactory attendance. (Def.'s Ex. 12, ECF No. 79-14.) The Notice stated that Plaintiff had been absent without leave since the beginning of December.[7] (*Id.*)

On May 12, 2008, Dr. Richardson provided another letter regarding Plaintiff's condition. (Def.'s Ex. 8 at 11, ECF No. 79-10.) Dr. Richardson noted that he had only been seeing Plaintiff on an intermittent basis due to Plaintiff's lack of financial resources. (*Id.*) Nevertheless, Dr. Richardson opined that Plaintiff had "made significant progress by distancing himself from" the work situation at the Columbus office. (*Id.*) Dr. Richardson concluded that Plaintiff "may return to duty within the next 60 days if he is relocated to a suitable reassignment." (*Id.*) Dr. Richardson, however, suggested that a position in Columbus would not be suitable. (*Id.*)

On June 2, 2008, Ms. Hawkins issued a Letter of Decision regarding the prior proposed Notice of Removal. (Def.'s Ex. 6, ECF No. 79-8.) Reviewing Plaintiff's disciplinary history, Ms. Hawkins concluded that over the past two years Plaintiff had not been dependable in reporting to work. (*Id.* at 2.) Accordingly, Ms. Hawkins found that removal was warranted and would be effective on June 7, 2008. (*Id.* at 1, 3.)

_____

[7] It appears that Velma Bonner, Manager of Distribution Operations, granted Plaintiff's earlier requests for leave from May 2007 until the beginning of December 2007, but denied later requests for leave. (Bonner Aff. 2, ECF No. 89-6.)

8

During the EEOC grievance process, Plaintiff identified two employees who he believed were treated more favorably than himself.[8] (Def.'s Ex. 13 at 8–9, ECF No. 79-15.) One individual, Alan New, was allowed to work a four-hour shift because he was receiving workers compensation. (*Id.* at 8.) The second employee, Tom Kohler, was able to transfer from Columbus because he applied for, and was selected to, a position with another post office. (*Id.* at 9.)

Finally, Plaintiff submits evidence from Dr. Richardson post-dating his termination from the USPS. In particular, Dr. Richardson provided a letter dated November 25, 2008 concerning Plaintiff's medical condition. Dr. Richardson's letter on this date stated that Plaintiff had "recently made significant progress in which I subsequently cleared him for duty." (Pl.'s Ex. I-15, ECF No. 89-9.) At this time, Dr. Richardson concluded that Plaintiff "could have been cleared for duty after November 7, 2007" if his employer had provided a suitable assignment outside of Columbus. (*Id.*)

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing

---

[8] Plaintiff continues to reference these individuals in opposing summary judgment.

the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III. ANALYSIS

### A. Reassignment to Dock Operations

As detailed above, Plaintiff's first claim is that the USPS' decision to reassign him to Dock Operation in April 2006 was race and/or gender discrimination in violation of Title VII. Title VII prohibits an employer from discriminating against an individual with respect to either race or gender. 42 U.S.C. 2000e-2(a). A plaintiff may establish discrimination by either direct evidence or by circumstantial evidence raising an inference of discrimination. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). Direct evidence is evidence that "if believed, requires a conclusion by the fact-finder that unlawful discrimination was at least a 'motivating

factor' for the employer's actions."[9] *Id.*

On the other hand, to establish a *prima facie* case of discrimination through circumstantial evidence, "a plaintiff must demonstrate (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class or classes was treated more favorably than he." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). "Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Id.* at 391–92. "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 392.

To establish that an employer's proffered reasons are pretextual, a plaintiff may "show[] by a preponderance of the evidence (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the action], or (3) that they were insufficient to motivate [the action]." *Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 487 (6th Cir. 2011). The Sixth Circuit has further explained:

---

[9]  In this case, although Plaintiff frequently uses the term direct evidence, none of the evidence Plaintiff presents, if believed, requires a conclusion that the USPS made its decisions for discriminatory reasons. Accordingly, the Court will apply the burden-shifting scheme used for indirect proof of discrimination.

A showing that a proffered reason had "no basis in fact" consists of evidence establishing that the proffered reasons for the employer's decision never happened, or are factually false. *Manzer*, 29 F.3d at 1084. To make a showing that the proffered reasons "did not actually motivate the employer's conduct," the plaintiff must present evidence "which tend[s] to prove that an illegal motivation was more likely than that offered by the defendant." *Id.*

We have previously stated that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Wexler*, 317 F.3d at 576; *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Finally, a showing that the proffered reasons were "insufficient to motivate the employer" consists of evidence that other employees, particularly employees not in the protected class, were not treated the same way, even though they engaged in substantially identical conduct. *Manzer*, 29 F.3d at 1084.

*Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 20 (6th Cir. 2007); *see also Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 379 (6th Cir. 2002) ("[T]o show that an employer's proffered nondiscriminatory explanation is pretext on the grounds that a similarly situated employee received disparate treatment for the same conduct, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects.") (internal quotations omitted, emphasis in original).

Here, even assuming that Plaintiff's reassignment to Dock Operations was an adverse action,[10] and that Plaintiff has met the other *prima facie* elements, Defendant is still entitled to summary judgment on this claim. Specifically, Plaintiff has failed to submit sufficient evidence demonstrating that Defendant's legitimate reason for the reassignment was pretextual. Rather,

---

[10] Defendant maintains that Plaintiff's reassignment was not an adverse action. In particular, Defendant contends that Plaintiff's opposition to the Dock Operations reassignment was based solely on his subjective belief that the position was undesirable. Plaintiff maintains, albeit in a somewhat conclusory fashion, that the Dock Operations position included many disadvantages, including lesser chance of advancement. The Court finds it unnecessary to reach this issue.

the evidence before the Court demonstrates that scheduling concerns, along with positional need, were the reasons for Plaintiff's reassignment. Defendant specifically submit, through the Affidavits of Mr. Brown and Mr. Wilkins, that Plaintiff was reassigned to Dock Operations to better meet his scheduling requests. The emails Defendant presents clearly reflect that Plaintiff was displeased that his start change had been altered, whether officially or constructively, to 3:00 p.m. while working at Tour 3. (*See* Def.'s Ex. 1 at 21–33, ECF No. 79-1.) Moreover, Plaintiff explicitly requested that management move him to a "different assignment that reflects a more suitable time frame . . . ." (*Id.* at 23.) Accordingly, when a supervisor was needed for Dock Operations, Mr. Brown states that he chose to reassign Plaintiff. (Brown Aff. 1, ECF No. 79-2.) Although this position did not exactly match Plaintiff's desired position, the start time was closer to Plaintiff's 1:30 p.m. preference. (*See* Kabir Aff. 1, ECF No. 79-1.)

From the current record, a reasonable jury could not find that intentional discrimination, based on either race or gender, motivated Defendant's decision to reassign Plaintiff. Mr. Brown, who like Plaintiff is a black male, states that he made the decision to reassign Plaintiff and that neither race nor gender had any role in his decision. (Brown Aff. 1–2, ECF No. 79-2.) Although Plaintiff asserts that Mr. Kelly, the Plant Manager, made the decision, there is no evidentiary basis for this assertion. Moreover, while Plaintiff stresses that other employees were not reassigned to the Docks, there is no evidence that any other employees were adamantly requesting an earlier start time.[11] Ultimately, under the circumstances, the trier of fact could not

---

[11] Under the circumstances of this case, the fact that a white male supervisor, Brad Coons, was selected over Plaintiff for a different position to which both individuals applied, does not provide sufficient grounds for inferring that Plaintiff's later reassignment to Dock Operations was racially motivated. Within his Affidavit, Mr. Brown states that he selected Mr. Coon because the placement caused the fewest challenges from an operational standpoint. (Brown Aff.

13

reasonably conclude that Defendant's reasons for reassigning Plaintiff were pretextual.

**B.      Non-Selection for Chicago Position**

Within his second claim, Plaintiff maintains that the USPS retaliated against him for

earlier EEO activity by failing to select him for the District Complement Coordinator Position in

Chicago, IL.  In addition to prohibiting discrimination, "Title VII also prohibits an employer

from retaliating against an employee who has opposed an 'unlawful employment practice.'"

*Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (quoting 42 U.S.C.

§ 2000e-3(a)).  To set forth a *prima facie* case of retaliation a plaintiff must demonstrate that

"(1) he or she engaged in protected activity, (2) the employer knew of the exercise of the

protected right, (3) an adverse employment action was subsequently taken against the employee,

and (4) there was a causal connection between the protected activity and the adverse employment

action."  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).  Moreover, "[t]o

establish causation, [a plaintiff] must proffer evidence sufficient to raise the inference that [his or

her] protected activity was the likely reason for the adverse action."  *Alexander v. Ohio State

Univ. College of Social Work*, 429 F. App'x 481, 489 (6th Cir. 2011) (internal quotations

omitted).

Plaintiff's retaliation claim applies the same burden shifting analysis as his discrimination

claim.[12]  *See id.* at 488.  Accordingly, if Plaintiff meets his *prima facie* burden, "the burden shifts

_____

6, ECF No. 79-2.)  The merits of the earlier employment decision are not before the Court and
Plaintiff has provided limited evidence, outside of conclusory allegations, regarding the selection
for this position.

[12]  Like his discrimination claims, Plaintiff's retaliation claims are based on
circumstantial evidence.

14

to Defendants to articulate some legitimate, nondiscriminatory reason for the action." *Id.* at 489 (internal quotations omitted). If Defendant is able to articulate such a reason, Plaintiff "must demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for [retaliation]." *Id.* (internal quotations omitted, alteration in original).

In this case, Defendant is entitled to summary judgment on Plaintiff's retaliation claim for multiple reasons. First and foremost, Plaintiff has failed to produce sufficient evidence for the trier of fact to find that the decisionmaker knew of his exercise of a protected right. As detailed above, the interviewing and selecting officer for the Chicago Position was Ms. Israel. Ms. Israel testified to working in Chicago and being unaware of any EEO activity of Plaintiff, who worked in Columbus. (Israel Aff. 1, ECF No. 79-5.) Plaintiff maintains that Ms. Israel was aware of his protected activity because during the selection process she contacted the Columbus office. (*See id.* at 1, 4.) Nevertheless, Ms. Israel's Affidavit reflects that all she learned from contacting Plaintiff's office was that he had been out of work due to stress. (*Id.*) She also provides that she asked no further questions regarding the situation. (*Id.* at 1.) Accordingly, there is simply insufficient evidence in the record for the finder of fact to conclude that Ms. Israel knew of Plaintiff's EEO activity.[13]

Moreover, even assuming that Plaintiff could establish a *prima facie* case, based on the evidence before the Court a reasonable jury could not find that Defendant's legitimate reason was a pretext for retaliation. Ms. Israel states that she made her selection decision based on the candidates interviews, and that Plaintiff did not address her questions as well as Mr. Bowles.

---

[13] Although Plaintiff's retaliation claim is based on his EEO activity, the Court also finds insufficient evidence for a jury to reasonably conclude that Ms. Israel was aware that Plaintiff had requested an accommodation for disability.

15

(Israel Aff. 1, ECF No. 79-5.)  Additionally, Ms. Israel reports that at the time of the selection

process Mr. Bowles had experience as a complement coordinator.  (*Id.*)  Ms. Israel also states

that Mr. Bowles had excellent references.  (*Id.*)  Comparatively, Plaintiff had not provided any

references from his current position in Columbus.[14]  (*Id.*)  Plaintiff maintains that he reported his

knowledge of the relevant complement system.  Even assuming Ms. Israel was mistaken

regarding Plaintiff's knowledge of the relevant systems,[15] however, Ms. Israel considered

multiple factors in her decision, including Mr. Bowles prior experience.  (*See id.*)  Ultimately,

based on the evidence before the Court, even assuming Ms. Israel's decision was flawed, the

finder of fact could not reasonably conclude that her proffered reasons were pretextual and

masked a retaliatory motive.

Plaintiff appears to contend that even if Ms. Israel did not have a retaliatory motive, his

Columbus managers influenced her decision.  Within the employment context, an illegitimate

motive of a supervisor may, in certain situations, be imputed to the ultimate decisionmaker.  *See*

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351–53 (6th Cir. 2012) (explaining that under

certain circumstances a neutral supervisor may act as a conduit of a supervisor's animus).  Here,

however, there are no grounds for applying any such doctrine.  All Ms. Israel discovered from

contacting the Columbus office was that Plaintiff had been missing work due to stress, a fact that

Plaintiff does not dispute.  Based on the testimony of Ms. Israel, there is simply no indication

---

[14]  Plaintiff contends that he was not required to provide references from his Columbus office.  Although this is likely true, Ms. Israel was capable of drawing a negative inference from the fact that he listed no references from his most recent position.  Such an inference does not suggest a retaliatory motive.

[15]  Ms. Israel's statements suggest that there were multiple systems relevant to the Complement Coordinator position.  (Israel Aff. 1, ECF No. 79-5.)

that bias input from supervisors influenced her selection decision.

Finally, Plaintiff contends that the timing of Ms. Israel's decision demonstrates a retaliatory motive. Plaintiff specifically maintains that on December 17, 2007, the same day as Ms. Israel's ultimate selection decision, there was an EEO field operations inquiry into Plaintiff's allegations of retaliation on the part of Ms. Bonner. The Court recognizes that temporal proximity may, under certain circumstances, give rise to an inference of retaliatory motive. *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008) (discussing case law on temporal proximity). Once again, however, there is no evidence that Ms. Israel knew of Plaintiff's EEO activity, much less of the EEOC's specific actions on December 17, 2007. Accordingly, under the circumstances, the Court finds any coincidence in timing insufficient to establish a genuine dispute of material fact.

## C.     **Plaintiff's Termination**

Plaintiff brings distinct, although interrelated, claims arising from his termination. First, Plaintiff brings a claim under the Rehabilitation Act asserting that Defendant failed to accommodate his disability. Second, Plaintiff maintains that Ms. Hawkins retaliated against him, in violation of Title VII, in removing him from the USPS. Finally, Plaintiff contends that Ms. Hawkins decision to remove him also constituted racial discrimination in violation of Title VII.

### 1.     **Failure to Accommodate**

Under the Rehabilitation Act, "[t]he federal government shall be a model employer of individuals with disabilities." 29 C.F.R. § 1614.203(a). More specifically, "[t]he Rehabilitation Act the United States Postal Service from discriminating against individuals by reason of their disability." *Amann v. Potter*, 105 F. App'x 802, 804 (6th Cir. 2004). The Rehabilitation Act

applies the same standards as the American with Disabilities Act of 1990 ("ADA"). 29 U.S.C.

§ 794(d). The Sixth Circuit has provided the following framework in assessing failure to

accommodate claims:

> In order for a plaintiff to prevail on a claim of disability discrimination based on
> failure to accommodate, the plaintiff must show that: (1) she is an individual with a
> disability; (2) she is qualified for the position; (3) the agency was aware of her
> disability; (4) an accommodation was needed because a causal relationship existed
> between the plaintiff's disability and her request for accommodation; and (5) the
> agency did not provide the necessary accommodation.

*Amann v. Potter*, 105 F. App'x 802, 805 (6th Cir. 2004).

To be disabled "an individual must (1) have a physical or mental impairment which

substantially limits him or her in at least one major life activity, (2) have a record of such an

impairment, or (3) be regarded as having such an impairment." *Mahon v. Crowell*, 295 F.3d 585,

590 (6th Cir. 2002) (internal quotations omitted). "Major life activities include functions such as

caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, and working." *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004) (internal

quotations omitted). To establish a substantial limitation in the major life activity of working, a

plaintiff must demonstrate a substantial limitation in "perform[ing] either a class of jobs or a

broad range of jobs in various classes . . . ." *Watts v. United Parcel Serv.*, 378 F. App'x 520, 525

(6th Cir. 2010) (internal quotations omitted). "The inability to perform a single, particular job

does not constitute a substantial limitation in the major life activity of working." *Spees v. James

Marine, Inc.*, 617 F.3d 380, 397 (6th Cir. 2010) (internal quotations omitted).

To be a qualified individual for the purposes of the Rehabilitation Act, a person must be

"capable of performing all essential functions of [his or] her position *with or without*

18

accommodation . . . ." *Benaugh v. Ohio Civil Rights Comm'n*, 278 F. App'x 501, 508 (6th Cir. 2008) (emphasis in original). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n).

In this case, there is no material dispute of fact and Defendant is entitled to judgment with regards to Plaintiff's failure to accommodate claim. Plaintiff maintains that Defendant failed to provide him an accommodation by failing to allow him to work a four-hour shift schedule and by failing to reassign him to a position outside Columbus.[16] Nevertheless, the evidence reflects that during the relevant time frame Plaintiff was either (1) not a qualified individual or (2) not disabled within the meaning of the Rehabilitation Act. Plaintiff, therefore, was not entitled to a reasonable accommodation.

The letters of Dr. Richardson, which are undisputed for the purpose of summary judgment, are the only significant evidence in the record regarding Plaintiff's medical condition.[17] These records reflect that from May 2007 to May 2008, Plaintiff was unable to work due to psychological impairments. (*See generally* Def.'s Ex. 8.) On May 12, 2008, Dr. Richardson noted that Plaintiff had made significant progress and cleared him to return to work, within sixty days, in any suitable reassignment. (*Id.* at 11.) Dr. Richardson noted that a suitable

---

[16] The details are unclear regarding Plaintiff's request(s) for an accommodation. Although Dr. Richardson's notes included some suggestion of a part-time schedule, the record does not reflect Plaintiff actually requested such an accommodation. Moreover, although Plaintiff requested that the USPS transfer him to Chicago it is not clear that Plaintiff linked this request to his disability. Regardless, as the parties do not focus on this issue, the Court will assume, without deciding, that Plaintiff adequately requested an accommodation.

[17] As detailed above, there is at least one note from Dr. Pelf concurring with Dr. Richardson's conclusions. (Pl.'s Ex. J-9, ECF No. 89-10.)

assignment would be one outside of Columbus, due to Plaintiff's past experiences. (*Id.*)

In light of this evidence, a reasonable jury could not conclude that Plaintiff was a qualified individual from May 2007 to May 2008. Reliable attendance is almost always an essential function of a job. *Melange v. City of Ctr. Line*, No. 11–1053, 2012 WL 1959319, at *3 (6th Cir. May 31, 2012) ("This court has flatly held that [a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified individual protected by the ADA.") (internal quotations omitted). Here the record evidence reflects, and Plaintiff does not seriously dispute, that reliable attendance was an essential function of Plaintiff's USPS position. From May 2007 to May 2008, Plaintiff's psychologist did not clear him to return to work. Moreover, it is undisputed that Plaintiff did in fact fail to attend work during this period. Although Dr. Richardson's letters suggest that certain accommodations, such as reassignment or a part-time schedule, may have hastened Plaintiff's recovery, he did not approve Plaintiff to return to any form of work during this period.[18] Accordingly, given the undisputed nature of Dr. Richardson's letters, a reasonable jury could not find that Plaintiff was qualified, with or without the accommodations in question, during this period. *Cf. Melange*, 2012 WL 1959319, at *3 (noting that because a manual labor position required attendance, the plaintiff needed to show that he was authorized to return to work prior to his termination to be a qualified individual).

The Court also finds that following May 2008, there is insufficient evidence for the trier

---

[18] In his November 25, 2008, Dr. Richardson states that Plaintiff would have been able to return to work as early as November 7, 2007, if he was reassigned outside of Columbus. (Pl.'s Ex. I-15, ECF No. 89-9.) Dr. Richardson's earlier notes, however, do not reflect that he actually cleared Plaintiff to perform any position during this time. (*See* Def.'s Ex. 8 at 8, ECF No. 79-10.) Nevertheless, for the reasons described below, once Dr. Richardson cleared Plaintiff to return to work in other locations, and only excluded a particularized position, there is not adequate support for disability within the meaning of the Rehabilitation Act.

of fact to find that Plaintiff was disabled within the meaning of the Rehabilitation Act. In May 2007, Dr. Richardson noted that Plaintiff was having problems with thought process, specifically concentration and focus. (*Id.* at 2.) The only limitations Dr. Richardson discussed in the remainder of the letters, however, were regarding Plaintiff's ability to work. (*See generally id.*) Dr. Richardson's May 12, 2008 letter reflected that Plaintiff had made significant progress. (*Id.* at 11.) The only mental limitation Dr. Richardson discussed at this time was his inability to work in a Columbus assignment due to his past experiences. (*Id.*) Based on these circumstances, the evidence indicates that Plaintiff was no longer disabled. In particular, Plaintiff's only documented limitation at this time with regard to a major life activity was his ability to work, and this limitation was confined only to the inability to perform a particular job at a single location. As discussed above, the inability to perform a single, particularized position does not constitute a substantial limitation. Accordingly, Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim.

### 2. **Retaliation and Discrimination**

Finally, Plaintiff maintains that MS. Hawkins' decision to terminate him was retaliation and/or discrimination in violation of Title VII. Defendant, on the other hand, maintains that Ms. Hawkins terminated Plaintiff due to his attendance record.

The Court concludes that Defendant is entitled to summary judgment on both Title VII claims. Plaintiff has failed to submit sufficient evidence to allow a reasonable jury to conclude that Ms. Hawkins termination decision was pretextual. It is undisputed that at the time of Plaintiff's June 2008 termination he had been absent from work since May 2007. Moreover, Plaintiff received warnings regarding his attendance in December 2007 and February 2008

regarding his attendance.  (Def.'s Ex. 11, ECF No. 79-13; Def.'s Ex. 12, ECF No. 79-14.)  This evidence demonstrates that Plaintiff's prolonged, and largely unapproved, absences from work were the reason for Plaintiff's termination.

Moreover, the Court finds the May 2007 incident involving Ms. Hawkins insufficient to raise a genuine dispute of fact regarding the reason for Plaintiff's termination.  Although Ms. Hawkins' comments regarding a celebration of white males were ill-advised, it does not appear that the comments were aimed at Plaintiff.  Furthermore, although multiple people complained, there is no evidence that other employees suffered any adverse action.  Plaintiff's ultimate termination occurred over a year after the incident and well after his EEO complaint regarding the issue.  Under these circumstances, and given Plaintiff's clear record of absenteeism, a reasonable fact finder could not infer discriminatory or retaliatory animus.

Plaintiff's evidence regarding other employees is also insufficient to raise an issue of material fact.  As detailed above, Plaintiff asserts that employees Alan New and  Tom Kohler were treated differently them himself.  Nevertheless, the evidence demonstrates that these employees faced different circumstances.  Mr. New was enrolled with the Office of Workers Compensation, and, therefore, received a part-time shift.  (Def.'s Ex. 13 at 8, ECF No. 79-15.)  Mr. Kohler was transferred because he was selected for a position that was competitively posted.  (*Id.* at 9.)  Most importantly, Plaintiff has failed to show that either of these individuals, or any other employee, had a similar attendance record to himself and went undisciplined.  Accordingly, any difference in treatment would not permit a reasonable fact finder to infer a retaliatory or discriminatory motive.

Finally, Defendant's attempt to settle this matter during the EEOC process does not create

a genuine dispute of material fact regarding retaliation.  Plaintiff maintains that Defendant

offered to transfer Plaintiff to Chicago contingent on him relinquishing his EEOC claims.

Plaintiff contends, at numerous points in briefing, that such an offer is proof of a retaliatory

motive.  The Court disagrees. The USPS no doubt has an incentive to resolve EEOC disputes

with its employees regardless of their merit.  When taken in context with the total circumstances

of this case, the fact that Defendant was willing to resolve this matter by granting Plaintiff a

transfer does not allow for a reasonable inference that Plaintiff's ultimate discharge was based on

retaliation.

## IV.  CONCLUSION

For the foregoing reasons,  Defendant's Motion for Summary Judgment is **GRANTED**.

(ECF No. 79.)  The Clerk is **DIRECTED** to remove this action from the Court's active docket.

Plaintiff's Motions for Jury Trial (ECF Nos. 83, 91) are **DENIED** in light of this Opinion and

Order.

**IT IS SO ORDERED.**

_____12-11-2012_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

23